UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIGI FAIRCHILD-LITTLEFIELD,<br><br>        Plaintiff,<br><br>   vs.<br><br>ATINELLO, et al.,<br><br>        Defendants. | 1:19-cv-01579-NONE-GSA-PC<br><br>**FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT THIS CASE BE DISMISSED, WITH PREJUDICE, FOR FAILURE TO STATE A CLAIM (ECF No. 17.)**<br><br>**OBJECTIONS, IF ANY, DUE WITHIN FOURTEEN DAYS** |

**I.    BACKGROUND**

      Gigi Fairchild-Littlefield ("Plaintiff") is a state prisoner proceeding *pro se* with this civil rights action under 42 U.S.C. § 1983.  On November 5, 2019, Plaintiff filed the Complaint commencing this action.  (ECF No. 1.)  On January 2, 2020, Plaintiff filed the First Amended Complaint as a matter of course.  (ECF No. 13.)  On October 30, 2020, the court dismissed the

First Amended Complaint for failure to state a claim, with leave to amend. (ECF No. 15.) On November 23, 2020, Plaintiff filed the Second Amended Complaint which is now before the court for screening. 28 U.S.C. § 1915. (ECF No. 17.)

## II. SCREENING REQUIREMENT

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). The Court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b)(1),(2). "Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that the action or appeal fails to state a claim upon which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii).

A complaint is required to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). While a plaintiff's allegations are taken as true, courts "are not required to indulge unwarranted inferences." Doe I v. Wal-Mart Stores, Inc., 572 F.3d 677, 681 (9th Cir. 2009) (internal quotation marks and citation omitted). To state a viable claim, Plaintiff must set forth "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678-79; Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009). While factual allegations are accepted as true, legal conclusions are not. Id. The mere possibility of misconduct falls short of meeting this plausibility standard. Id.

## III. SUMMARY OF SECOND AMENDED COMPLAINT

Plaintiff is presently incarcerated at Central California Women's Facility (CCWF) in Chowchilla, California, in the custody of the California Department of Corrections and Rehabilitation (CDCR), where the events at issue in the Second Amended Complaint allegedly

occurred. Plaintiff names as defendants Valerie Attinello (Nurse Practitioner), Albert Khoo (Dr.), B. Brown (on X-ray report), S. Zawolkow (ADA Coordinator), I. Singh (Dr.), J. Thissen (Appeals Coordinator), T. Cardoso (AGPA Healthcare), A. Hernandez (SSA(A)) HC Grievance Office), D. Youman (OT(T)), N. Snider (Correctional Officer (C/O)), Sergeant J. Alamo, J. Espinoza (Warden), and Doe#1 (C/O that called in disruptive inmate on Main Yard 6-11-19), Doe#2 (C/O present at "C" Clinic 1-17-19), CDCR, and Central California Women's Facility (CCWF) (collectively, "Defendants").

A summary of Plaintiff's allegations follows:

### Claim 1 – Eighth Amendment Medical and Non-medical Claims

On or about December 28, 2018, while on the main yard at CCWF, Plaintiff tripped on broken asphalt and fell and fractured the top of her tibia. She was initially unaware of the cause of subsequent pain.

On January 1, 2019, RN Jackson [not a defendant] issued Plaintiff crutches, but due to the distances Plaintiff was unable to navigate at CCWF with crutches. She was also issued a knee brace.

On January 11, 2019, Plaintiff again saw RN Jackson who phoned Nurse Practitioner (NP) Attinello. Plaintiff requested a wheelchair and x-rays. She returned the crutches and thought she was being issued a wheelchair. She was given a knee brace and an order was placed for x-rays.

The knee brace exacerbated the pain. Plaintiff had to continue going to her job assignments because in the past when she had an undocumented serious medical condition she received a Rules Violation Report and was punished, so Plaintiff continued limping around to avoid RVRs.

Between January 11 and January 16, 2019, Plaintiff went three times to the "C" Yard clinic requesting a wheelchair and asking if the x-rays could be moved to stat [*sic*] due to pain. (Second Amended Complaint (2ACP), ECF No. 17 at 8:20-22.)

On January 16, 2019, Plaintiff asked again and was told by staff to wait until she gets a ducat. She left, but after going about 20 yards the pain was so bad she could not take another

step, and she sat on the ground.

The ones that called were from the clinic 20 yards away and they were angry that they now had to contact the TTA (Triage and Treatment Area). The TTA arrived and took Plaintiff to 805[1] where the x-ray order was moved to stat and x-rays were taken. Plaintiff was issued a temporary wheelchair for two weeks. However, NP Attinello did not like that and issued a priority ducat to see her at the "C" clinic the next day because she felt Plaintiff had gone around her by being seen by the TTA.

On January 17, 2019, Plaintiff was seen by Defendant Nurse Practitioner Attinello. LVN Geraldine Canjura [not a defendant] was also there. Attinello told Plaintiff she had reviewed the x-ray and "There is nothing wrong with your knee," and that she was taking the wheelchair. (Id. at 9:7-8.) Plaintiff said, "It hurts to put any weight on it." (Id. at 9:9-10.) Attinello said that Plaintiff could have crutches. Plaintiff explained that she had already had crutches but the distances were too far, and even if she used crutches all the way to the chow hall she wouldn't be able to carry her tray. Attinello said, "Don't you have any friends?" (Id. at 9:13.) Plaintiff said, "Not here. This is prison. Do you think the past damage to my knee is why you can't see in the x-ray now what is wrong? I broke my kneecap in half back in 1990. Maybe that's why you can't see what's wrong now." (Id. at 9:14-16.) Attinello said, "You have never broken that knee." (Id. at 9:17.) Plaintiff said, "Yes I did, but it's never been a problem. It healed really well." (Id. at 9:17-18.) Attinello said, "If you had ever broken your knee before, it would show in the x-ray, no matter how long ago it was." (Id. at 9:19-20.) Plaintiff said to LVN Conjura, "Gerry, can you order my medical records from San Bernardino County Hospital for 1990-1991?" (Id. at 9:20-22.) Conjura said, "Yes, it will probably take about two weeks." (Id. at 9:22-23.) Attinello stated that she was taking the wheelchair and Plaintiff said she can't put any weight on her leg, that the doctor at 805 issued it to her for two weeks. Attinello said that it didn't matter what happened at 805 because she is Plaintiff's primary care physician. Plaintiff said, "I want to speak with the warden." (Id. at 9:27.) Attinello spoke with the officer on duty

---

[1] Plaintiff may be referring to Building 805.

4

at the clinic who told Plaintiff he was giving her a direct order to get out of the wheelchair. Plaintiff felt intimidated because ignoring a direct order in prison can lead to physical violence and she cannot afford 115's. Attinello had Conjura issue Plaintiff a walker. Plaintiff could not walk without excruciating pain, so she had to ride on the walker, which was life-threateningly dangerous. Walkers have a seat on them, but they are not to move while sitting on them because to do so is extremely dangerous because it will only move backwards. Plaintiff had to look backwards over her shoulder, propel herself by pushing with her left foot, and try to avoid falling over from any bumps and not run into anyone. After seeing Attinello on January 17, 2019, Plaintiff filed a healthcare appeal followed by a CDCR 1824 Request for Reasonable Accommodation form on January 19, 2019.

On January 30, 2019, Plaintiff submitted a CDC 7362 form stating, "There's something wrong with knee, won't support weight, can't walk without extreme pain, I want an MRI." (Id. at 10:15-17.) Plaintiff believed once there was proof of pain` she would get a wheelchair.

On January 31, 2019, Plaintiff was seen by Defendant Dr. Khoo who had also been on duty at 805 on January 16, 2019 and did the x-ray and order for the wheelchair. Dr. Khoo showed Plaintiff the x-ray image on the computer screen. A fracture is visible on the image at the top of the tibia, right where Plaintiff was feeling pain if she pressed without standing. Dr. Khoo said, "If it's not in the x-ray report, it's a calcium deposit." (Id. at 10:15-17.) Plaintiff said, "Where I broke the kneecap in half isn't in the report either, but I can see it because I know how it broke and it healed really well." (Id. at 10:23-25.) Dr. Khoo said, "You'll have to 602," but the way he said it made Plaintiff think it wouldn't matter if she did because when she asked if she could be issued a wheelchair because the walker was dangerous to ride backwards, he told her to "turn around and sit the other way." (Id. at 10:15-17.) Plaintiff said, "It's a walker, it won't move that way and I can't walk and it's dangerous." (Id. at 10:26-11:2.) He said, "You'll have to 602." (Id. at 11:2.) On January 31, 2019, Plaintiff filed a healthcare appeal.

On January 31, 2019, the Reasonable Accommodation Panel (RAP) convened. Plaintiff did not receive a copy of the RAP response until February 20, 2019. The response stated she was interviewed by Sergeant Alamo [not a defendant] on January 27, 2019 to determine if an

interim accommodation was needed.  RAP reports he observed Plaintiff in the dining hall with the walker, that she was walking unevenly but able to move without help.  Plaintiff's roommate, Janet Chevez [not a defendant], pushed the walker to the dining hall but not inside due to fear of a 115[2].  Her roommate was an ADA worker who could lose her job for pushing the walker.  The RAP denies the return of the wheelchair and states that Plaintiff has been "accommodated" with a temporary walker.  (Id. at 11:11-13.)  This shows deliberate indifference to the danger of riding a walker since Plaintiff could not walk without extreme pain.  The continuation of the walker they leave up to Plaintiff's Primary Care Provider, Attinello.

The RAP Staff present on January 31, 2019 were ADA Coordinator Zawolkow, Dr. Singh, Appeals Coordinator Thissen, AGPA Healthcare T. Cardoso, Healthcare Grievance Officer, A. Hernandez, and Youman. They would all be aware of the danger of using a walker as an "accommodation" to a wheelchair.  There were no shortages of wheelchairs.

Even after seeing the MRI showing a serious condition of which at least one was caused by being forced to walk with a tibia spine fracture that tore the lateral meniscus, Attinello continued to tell Plaintiff that she "could have crutches." (Id. at 10:15-17.)

Plaintiff submitted a Reasonable Accommodation Request on June 12, 2019 based on the MRI results of May 21, 2019.  She was finally given a wheelchair on June 19, 2019 when she could no longer walk at all, and after submitting additional appeals, letters, phone calls to parties outside, and threats of legal action.

Attinello's medical notes are in direct conflict with the CDC 7362 co-pay medical form. Attinello notes that Plaintiff does not want to put any weight on her knee, acknowledges that Plaintiff was in pain and wants to keep the wheelchair, but confuses other statements.  Plaintiff told her the pressure of the brace exacerbated the pain and made it hurt even when not standing or putting weight on it, so she wasn't wearing the brace.  Attinello continued to offer crutches or a cane, which would not work.

Plaintiff did not realize that "hell" was a profanity.  (Id. at 13:19-20.)  Plaintiff did not refuse examination.  Attinello ordered Plaintiff to leave due to her careless speech.  She was

---

[2] Rules Violation Report 115.

aware that the physical therapist suspected meniscal involvement.

When Plaintiff's records from San Bernardino County Hospital arrived on April 10, 2019, Plaintiff again saw Attinello, whose notes for this visit state that Plaintiff's chief complaint was chronic right knee pain, and under history of present illness states "presents to f/u chronic right knee pain since 1991." (Id. at 14:3.) Plaintiff's broken right knee is not in the x-ray report of January 16, 2019, but neither is the tibia spine fracture from a fall on December 28, 2018. Plaintiff had never had any history of chronic knee pain, and she could see the previous break in the x-ray Dr. Khoo showed her, but she knows how it looked, very faint, along with the tibia fracture.

The record also shows an ear infection that Plaintiff cannot get ear drops for until RN Jackson reports to Attinello that she can see mold.

Plaintiff believes that she probably would not have needed surgery if the wheelchair hadn't been taken on January 17, 2019. Attinello lied on Plaintiff's medical record and her replacement, Jeanne Taylor, believes what Attinello placed in the file.

Since the surgery performed on January 29, 2020, Plaintiff can walk pain free. Plaintiff has noticed repairs being made to the asphalt on CCWF's main yard. Plaintiff believes that Attinello knew there was a fracture in the x-ray at the top of Plaintiff's tibia and felt she could honestly say there's nothing wrong with Plaintiff's knee because technically there was nothing wrong with her knee until weight with the fracture tore up Plaintiff's meniscus when she had to walk on it. When Plaintiff saw Attinello on June 3, 2019 and she had the MRI results from May 21, 2019, Plaintiff asked Attinello, "Does it show the fracture at the top of my tibia?" (Id. at 16:16-21.) and Attinello said, "Surprisingly, that appears to have healed." (Id. at 16:21-22.)

In June of 2019, an incident involving other inmates in the cell Plaintiff was housed in occurred that caused the housing officers to throw chemical bombs into the cell. When Plaintiff was ordered to exit the cell by crawling backwards, additional injury occurred. After a couple of days Plaintiff could barely walk even in pain, but Plaintiff had to report to her job assignment or get an RVR because even after the MRI results showing multiple painful conditions, Attinello would not authorize a wheelchair. Attinello again offered crutches or a cane and told Plaintiff

7

she "had patients that had cancer." (Id. at 17:3-4.)  The gist Plaintiff got from this was that Plaintiff's issues to Attinello were frivolous.

On June 11, 2019, Plaintiff reported to her job assignment as a gym assistant.  Plaintiff had told her supervisors there that she had medical issues, so they were understanding, and she would work even though it caused her extreme pain.  But on that day Plaintiff told them she could hardly walk, and they said okay, go back.  On the way back Plaintiff's knee gave out completely.  Staff called the TTA and Plaintiff asked to be taken back to her cell.  The TTA said they weren't a taxi.  They also said I must be trying to get around my PCP.  The C/O on the main yard said, "I am giving you a direct order to walk," and Plaintiff said, "I don't see that happening." (Id. at 17:12-14.)  The C/O got his radio and called in a disruptive inmate.  Plaintiff lay on her stomach and put her hands behind her back.  The C/O said, "You don't have to put your face on the hot concrete," and Plaintiff said, "Oh, now you're concerned about my welfare." (Id. at 17:16-17.)  The C/O said, "Get up" after Plaintiff was cuffed behind her back. (Id. at 17:17-18.)  Since Plaintiff only had one leg the C/O and another officer frog-hopped Plaintiff down the sidewalk until C/O Camarillo [not a defendant] saw what was happening and got a wheelchair.  Plaintiff was wheeled to the "C" program office and placed in a cage until an IDAP worker brought a wheelchair and took Plaintiff to her cell.

Plaintiff couldn't walk and could barely stand.  Her roommate carried her to the bathroom and shower.  Plaintiff wrote to the ombudsman, and family members made phone calls trying to get a wheelchair provided.  Another inmate provided a walker so Plaintiff could be pushed around to the phone to make calls.  Plaintiff could not get to meals or go on ducats to the law library.  Plaintiff put in co-pays and 602's and another Reasonable Accommodation Report and was finally given a wheelchair per RAP on June 19, 2019.

Plaintiff couldn't walk without pain and had to continue to 602 to see a specialist and then to get surgery.  Plaintiff filed this action when it appeared the 602's, specialist, and surgery were going to be denied.

///

///

**Claim 2 -- Retaliation**

Plaintiff believes that Defendant Attinello taking the wheelchair and claiming there was nothing wrong with Plaintiff's knee set in motion a series of acts by others which Attinello knew would cause others, or reasonably should know would cause others to inflict constitutional harms.

Plaintiff knew that Attinello did not like her talking to the TTA on January 16, 2019, which would be Plaintiff exercising her right to free speech and telling them what was up with her and getting an x-ray and wheelchair, which Attinello took away the next day in retaliation.

Plaintiff believes retaliation was also present when defendant N. Snider wrote a chrono, the RAP denied the wheelchair, and Plaintiff's appeals were denied. Plaintiff knows that Attinello making Lipitor a "hot" med and not telling Plaintiff was intentional to make Plaintiff receive RVR 115's. (Id. at 18:27-28.)

Plaintiff has written 602 appeals which counts as exercising a First Amendment right, possibly since writing is a form of speech. When Plaintiff put in specifics in her 3rd appeal, at first the appeals coordinator said they were duplicates of the 1st and 2nd, until Plaintiff sent a rejection notice to headquarters calling shenanigans [*sic*]. (Id. at 19.)

**Relief Requested**

Plaintiff requests a trial as relief.

### IV. PLAINTIFF'S CLAIMS

The Civil Rights Act under which this action was filed provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

"[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Graham v. Connor, 490 U.S. 386, 393-94 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)); see also Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 618 (1979); Hall v. City of Los Angeles, 697 F.3d

1059, 1068 (9th Cir. 2012); Crowley v. Nevada, 678 F.3d 730, 734 (9th Cir. 2012); Anderson v. Warner, 451 F.3d 1063, 1067 (9th Cir. 2006). "To the extent that the violation of a state law amounts to the deprivation of a state-created interest that reaches beyond that guaranteed by the federal Constitution, Section 1983 offers no redress." Id.

To state a claim under § 1983, a plaintiff must allege that (1) the defendant acted under color of state law and (2) the defendant deprived him or her of rights secured by the Constitution or federal law. Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006); see also Marsh v. Cnty. of San Diego, 680 F.3d 1148, 1158 (9th Cir. 2012) (discussing "under color of state law"). A person deprives another of a constitutional right, "within the meaning of § 1983, 'if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made.'" Preschooler II v. Clark Cnty. Sch. Bd. of Trs., 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978)). "The requisite causal connection may be established when an official sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms." Preschooler II, 479 F.3d at 1183 (quoting Johnson, 588 F.2d at 743). This standard of causation "closely resembles the standard 'foreseeability' formulation of proximate cause." Arnold v. Int'l Bus. Mach. Corp., 637 F.2d 1350, 1355 (9th Cir. 1981); see also Harper v. City of Los Angeles, 533 F.3d 1010, 1026 (9th Cir. 2008).

### A. Doe Defendants

Plaintiff names two Doe Defendants who are correctional officers, Doe #1 (who called in Plaintiff as a disruptive inmate on the Main Yard on June 11, 2019), and Doe #2 (who was present at the "C" Clinic on January 17, 2019 and told Plaintiff he was giving her a direct order to get out of the wheelchair). Plaintiff alleges no other conduct against Plaintiff by either of these Doe Defendants. These allegations do not state any claims against the Doe Defendants for interfering with Plaintiff's medical care because there are no facts showing that they knew about Plaintiff's serious medical need, or that they disregarded an excessive risk of harm to Plaintiff causing her injuries. Therefore, Plaintiff fails to state any claims against the two Doe Defendants.

### B. Eleventh Amendment Immunity

Plaintiff names as defendants CDCR and the Central California Women's Facility. "The Eleventh Amendment prohibits federal courts from hearing suits brought against an unconsenting state." Brooks v. Sulphur Springs Valley Elec. Co., 951 F.2d 1050, 1053 (9th Cir.1991); see also Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54, 116 S.Ct. 1114 (1996); Puerto Rico Aqueduct Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 144, 113 S.Ct. 684 (1993); Tennessee v. Lane, 541 U.S. 509, 517 (2004). The Eleventh Amendment also bars suits against a state's agencies. See Puerto Rico Aqueduct, 506 U.S. at 144; Brooks, 951 F.2d at 1053; Mitchell v. Los Angeles Community College Dist., 861 F.2d 198, 201 (9th Cir. 1989); Beentjes v. Placer Cnty. Air Pollution Control Dist., 397 F.3d 775, 777 (9th Cir. 2005). Thus, the California Department of Corrections is entitled to Eleventh Amendment immunity. In addition, California prisons are entitled to Eleventh Amendment immunity. Lopez v. Wasco State Prison, 2008 WL 5381696, at *4 (E.D. Cal. Dec. 22, 2008) (citing Keel v. California Dept. of Corrections and Rehabilation, 2006 WL 1523121, *2 (E.D. Cal. 2006)). Thus, Defendants CDCR and Central California Women's Facility are entitled to Eleventh Amendment immunity and must be dismissed.

### C. Defendants B. Brown and Warden Espinoza – No personal participation

In the Second Amended Complaint, Plaintiff fails to allege facts showing that defendants B. Brown or Warden Espinoza personally acted against her. Plaintiff fails to attribute any personal act to either of these defendants. Plaintiff cannot state a claim against these defendants unless she demonstrates in her allegations that each of them, identified by name, personally acted or failed to act, violating Plaintiff's rights. Liability may not be imposed under a theory of *respondeat superior*, and there must exist some causal connection between the conduct of each named defendant and the violation at issue. Iqbal, 556 U.S. at 676-77; Lemire v. California Dept. of Corrections and Rehabilitation, 726 F.3d 1062, 1074-75 (9th Cir. 2013); Lacey v. Maricopa County, 693 F.3d 896, 915-16 (9th Cir. 2012) (*en banc*); Starr v. Baca, 652 F.3d 1202, 1205-08 (9th Cir. 2011), cert. denied, 132 S.Ct. 2101 (2012).

Plaintiff only alleges in the Second Amended Complaint that defendant B. Brown was "on x-ray report" (ECF No. 17 at 6:15), and when Defendant Attinello took away Plaintiff's

wheelchair, Plaintiff said, "I want to speak with the warden" (Id. at 9:27). This is not enough to show that defendants Brown or Espinoza personally acted against Plaintiff.

Therefore, Plaintiff fails to state any claims in the First Amended Complaint against defendants Brown or Espinoza

### D. Reasonable Accommodation Panel (RAP)

Plaintiff refers to the Reasonable Accommodation Panel (RAP) and alleges that Defendants Zawolkow, Singh, Thissen, Cardoso, and Hernandez were members of the RAP who were present on January 1, 2019 when the RAP convened and "would all be aware of the danger of using a walker as an 'accommodation' to a wheelchair." (ECF No. 17 at 11:4,17-23.) However, Plaintiff does not attribute any personal conduct against her by any of the individual members of the RAP.

Plaintiff may not allege that the RAP collectively delayed or denied her medical care. Plaintiff must demonstrate in her allegations how each Defendant, identified by name, personally acted or failed to act, violating Plaintiff's rights. Plaintiff may not attribute liability to a group of defendants but must "set forth specific facts as to each individual defendant's" deprivation of his rights. Leer v. Murphy, 844 F.2d 628, 634 (9th Cir. 1988); see also Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

Therefore, Plaintiff fails to state any claims against the RAP or against any of the named individual members of the RAP (Defendants Zawolkow, Singh, Thissen, Cardoso, and Hernandez).

### E. Medical Claim – Eighth Amendment

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). The two-part test for deliberate indifference requires the plaintiff to show (1) "'a serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." Jett, 439 F.3d at 1096 (quoting McGuckin v. Smith, 974 F.2d 1050,

1059 (9th Cir. 1992), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (*en banc*) (internal quotations omitted)). Deliberate indifference is shown by "a purposeful act or failure to respond to a prisoner's pain or possible medical need, and harm caused by the indifference." Id. (citing McGuckin, 974 F.2d at 1060). Deliberate indifference may be manifested "when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." Id. Where a prisoner is alleging a delay in receiving medical treatment, the delay must have led to further harm in order for the prisoner to make a claim of deliberate indifference to serious medical needs. McGuckin at 1060 (citing Shapely v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985)).

"Deliberate indifference is a high legal standard." Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004). "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" Id. at 1057 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'" Id. (quoting Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1188 (9th Cir. 2002)). "A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment." Id. at 1060. "[E]ven gross negligence is insufficient to establish a constitutional violation." Id. (citing Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990)).

"A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981) (internal citation omitted). To prevail, a plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances . . . and . . . that they chose this course in conscious disregard of an excessive risk to plaintiff's health." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations omitted).

Plaintiff has shown that she had a serious medical need because she suffered with serious pain to her right knee. However, Plaintiff has not shown that any of the Defendants acted with

deliberate indifference to a substantial risk of serious harm to Plaintiff's health.  Under Plaintiff's allegations it is apparent that she was provided with medical care and her issues were being addressed.  X-rays were ordered and reviewed and did not show that a break to her tipia had occurred.  Plaintiff complains of pain but does not allege that she was not offered or provided with pain medications. Instead, Plaintiff contends that the accommodations offered to her – a walker, knee brace, and cane – were insufficient.  She desired to have a wheelchair, but she alleges no facts showing that the offered accommodations, if used correctly and appropriately, would not have successfully addressed her medical claim.  Nor has Plaintiff successfully connected the denial of a wheelchair with the ultimate tearing of her meniscus and resulting surgery.  It is only Plaintiff's conjecture that such a link exists between the two.

At most, Plaintiff may be able state a claim for negligence, which is not actionable in this § 1983 action.  At this juncture court finds that Plaintiff at most has only shown a difference of opinion between her and her health care providers regarding Plaintiff's treatment.

Therefore, the court finds that Plaintiff fails to state a medical claim under the Eighth Amendment against any of the Defendants.

### F. Retaliation – First Amendment Claim

"Prisoners have a First Amendment right to file grievances [and lawsuits] against prison officials and to be free from retaliation for doing so." Watison v. Carter, 668 F.3d 1108, 1114 (9th Cir. 2012) (citing Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009)).  "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005).  To state a cognizable retaliation claim, Plaintiff must establish a nexus between the retaliatory act and the protected activity. Grenning v. Klemme, 34 F.Supp.3d 1144, 1153 (E.D. Wash. 2014).

Plaintiff alleges in the Second Amended Complaint that Defendant Attinello took away the wheelchair she was using, told Plaintiff there was nothing wrong with her knee, and failed to

offer her any accommodation that would make it easier for Plaintiff to ambulate at the prison. Plaintiff also claims that defendant N. Snider acted against her by writing a chrono, that the RAP denied her a wheelchair, that prison officials denied Plaintiff's appeals, and that Defendant Attinello intentionally caused Plaintiff to receive RVR 115's by "making Lipitor a 'hot' med and not telling Plaintiff." (Id. at 18:27-28.)  Although it is unclear how Defendant Snider acted against Plaintiff by writing a chrono, or how Defendant Attinello acted against Plaintiff by concealing information about Lipitor, the other acts described could all be considered adverse acts against Plaintiff.

Plaintiff alleges that she participated in the prison appeals process when attempting to obtain better medical care, that she filed healthcare appeals against Defendant Attinello, and that she complained to the TTA about her pain and insufficient care.  These are all actions by Plaintiff exercising her First Amendment rights to file prison appeals and complain about her inadequate medical care.

However, Plaintiff has not alleged facts showing that any of the Defendants acted adversely against her *because* she was exercising a protected right, or that the adverse actions did not reasonably advance a legitimate correctional goal. At most it demonstrates again that Plaintiff had a deeply held disagreement with prison staff regarding the use of a wheelchair as opposed to other assistive devices which were offered.   Therefore, the court finds that Plaintiff fails to state a cognizable claim for retaliation.

## V.     CONCLUSION AND RECOMMENDATIONS

For the reasons set forth above, the court finds that Plaintiff fails to state any cognizable claims in the Second Amended Complaint against any of the Defendants for violating her constitutional or other federal rights. Under Rule 15(a) of the Federal Rules of Civil Procedure, "[t]he court should freely give leave to amend when justice so requires."  The Court previously granted Plaintiff leave to amend the complaint, with ample guidance by the Court.  Plaintiff has now filed two complaints without stating any claims upon which relief may be granted under § 1983.

The court is persuaded that Plaintiff is unable to allege any facts, based upon the circumstances she challenges, that would state a cognizable claim under section 1983. "A district court may deny leave to amend when amendment would be futile." Hartmann v. CDCR, 707 F.3d 1114, 1130 (9th Cir. 2013). Here, the court finds that the deficiencies outlined above are not capable of being cured by amendment, and therefore further leave to amend should not be granted. 28 U.S.C. § 1915(e)(2)(B)(ii); Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir. 2000).

Therefore, **IT IS HEREBY RECOMMENDED** that:

1. Pursuant to 28 U.S.C. § 1915A and 28 U.S.C. § 1915(e), this action be dismissed with prejudice for failure to state a claim upon which relief may be granted under § 1983; and

2. The Clerk be directed to close this case.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within **fourteen (14) days** from the date of service of these Findings and Recommendations, Plaintiff may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Plaintiff is advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **October 24, 2021**                    **/s/ Gary S. Austin**
                                                               UNITED STATES MAGISTRATE JUDGE